1839.

Whitlock
v.
Duffield and
others.

---

## WHITLOCK v. DUFFIELD AND OTHERS.

A LEASE contained a clause that at the end of the term, buildings should be taken at a valuation, or the lessors would grant a new lease for the term of twenty years *upon such terms as such lessors, their heirs, &c., might think proper, and be approved of by the tenant, &c. Held,* that the clause was void for uncertainty.

A distinction exists between a clause to grant a new lease, and one to renew the lease. In the latter there is an implied covenant to give a new one for the same term, rent and conditions. The rent to be paid is as essential a part of the contract to give a lease, as the price is upon a contract to sell. If the agreement does not contain it, and it is not supplied by other competent evidence, no performance can be enforced.

A covenant to appoint arbitrators to settle value will not be executed. The utmost length which the court has gone is, that where there is an agreement to sell at a valuation, and no mode of making it is fixed, the court will do it in its ordinary manner. Such a contract implies the intervention of others to ascertain the value. But when the price is to be adjusted by the parties themselves, the interference of this court would be adding a material ingredient to the contract in a manner not even impliedly consented to.

Where a clause to grant a new lease is void for uncertainty, the lessor, by a tender of a further lease at a larger rent, does not thereby give such a construction to the covenant, as allows the tenant to require a reasonable new lease.

Awards of referees under a rule of court and verdicts are so from the

same footing, that what will induce the court to grant a new trial, will be sufficient to set aside an award.

It seems that an arbitrator cannot impeach the award by his own evidence.

Where a clear assent is given to an award of arbitrators, after the result has been reached by them in an irregular manner (as by putting their individual ideas of amounts together, and making a third part of the whole the amount of their verdict) the award will stand.

THE bill in this cause was filed for the purpose of either obtaining payment of the appraised value of a building erected by the complainant on leasehold premises, or to compel a renewal of a lease, calling upon the court to ascertain what would be a proper and equitable rent.

On the 1st of June, 1814, a lease was executed by persons now represented by the defendants, to one Nathaniel Howland, of a lot of ground in the village of Brooklyn. The rent was $152 50 per annum, and the demise was for twenty years of a certain tract or parcel of ground suitable for a rope-walk, in the village of Brooklyn, and on which a new rope-walk, recently built by the party of the second part, under a previous agreement, then stood.

The lease contained a mutual covenant that the building then erected, or to be erected, by the party of the second part, and which should be standing and being on the premises, at the expiration of the lease, that is on the 1st of June, 1834, should be appraised by three indifferent freeholders, of Brooklyn—the one to be chosen by the parties of the first part, and the other by the party of the second part, and the third by the two appraisers : and the party of the first part should either pay the appraised value of the said buildings and improvements to the party of the second part, his heirs, &c., or that the parties of the first part would grant a new lease for the said premises for the term of twenty years, upon such terms as they, the parties of the first part, their heirs, &c., might think proper, and as might be approved by the party of the second part, his heirs, &c. And in case the party of

1839.

Whitlock
*v.*
Duffield and
others.

the second part should not approve of the terms so offered by the parties of the first part, then he should have the right to remove such buildings and improvements, and every part thereof, within the space of three months after the expiration of the lease.

A rope-walk was erected and in operation in 1834, when the transaction between the parties took place. The lease had come by mesne assignments to the complainant.

On the 1st of March, 1832, the defendants, representing the lessors, gave a written notice to the complainant of their having appointed Joseph Sprague an appraiser on their behalf under the covenant in the lease, to estimate the value of the buildings, and requested him to appoint an appraiser on his own part. On the 3d of March, the complainant nominated Daniel Roberts. These two chose Alexander Birbeck as the third appraiser.

On the 4th of April, 1834, an instrument under seal was entered into signed by the defendants and the complainant, in which, after reciting the appointments respectively of the appraisers and the selection of Birbeck by the other two, there is the following clause : " Now this " agreement witnesseth, that the said Margaretta Duffield, " Anna Prince, Susan Lawrence, Samuel A. Willoughby, " and Margaret his wife, and Sidney B. Whitlock, have " and hereby do agree to stand to, abide and perform the " appraisement and valuation to be made by the said Joseph " Sprague, Daniel Roberts and Alexander Birbeck, under " and in pursuance of such covenant contained in said " lease, after such appraisement shall have been signified " to us in writing by the said appraisers."

On the 2d of June, 1834, the appraisers made their award, by which they found that having examined the buildings erected and then standing on the premises, and which were so standing on the 1st of June, 1834, they did appraise and value the same at $2,307.

This award being delivered to the defendants, they, on the 3d of June, 1834, gave a written notice to the complainant, that they refused to pay the amount of the valuation, and then tendered him a new lease of the premises

for the term of 20 years at the annual rent of $6,000, payable quarterly.

On the 19th of June, 1834, the complainant through his solicitor demanded payment of the amount awarded. This being declined, the present bill was filed, which seeks either payment of the amount, or a new lease upon equitable terms to be settled by the court : Much testimony has been taken, principally as to what would be a proper rent for the premises, and as to certain declarations and assurances of the parties, that no renewal of the lease should be granted. Some portions of this evidence are referred to in the opinion.

*Mr. Brinckerhoff*, for the complainant.

*Mr. Waring* and *Mr. Mason*, for the defendants.

THE ASSISTANT VICE-CHANCELLOR :—The first important question in this cause to which I shall direct my attention, is the legal operation of the covenant in the lease to grant a new one upon the expiration of the term ; the next will be, whether upon the construction given by the complainant, the stipulation has been complied with in the lease proffered ; and if not, whether the offer of such lease is a waiver of any legal defence, and binds the defendant to give a lease which the court shall deem reasonable. On these questions depends that branch of the relief sought, which refers to the execution of a new lease. And I shall then examine the effect of the submission, with a view to the other branch of relief, viz. the payment of the amount of the award.

I. It is urged on behalf of the defendants, that this covenant is too vague and uncertain to admit of being enforced by this court ; that by its terms the granting of a new lease is in effect left entirely to the decision of the lessors. If the situation of things upon the expiration of the old lease was such as that a new one could be mutually agreed upon, it should be granted for 21 years more. But if the lessors did not think proper to renew it, they could

not be compelled to do so, and the proffer of any lease was unnecessary. Hence they might proffer one upon any terms; one which could not be accepted. That the defendant was clearly not bound to take a renewal, but might refuse and then remove his buildings; and if he was not bound, the lessors should not be.

Upon the point of the uncertainty of the lease, the case of *Abeel* v. *Radcliff*, (13 *Johns. Rep.* 297,) was relied upon. In that case the lessors in a lease covenanted that at the expiration of the term, they would take the buildings at an appraisal to be made by three indifferent men, *or let the said lot for a yearly rent* to be fixed by three indifferent men to be chosen by the parties.

The court (Van Ness, Justice, delivering the opinion) held, that the covenant was totally void for uncertainty. How far such uncertainty might be obviated by a bill in the court of chancery, to which the decision of the point properly appertained, he did not know; but proceeding upon the naked agreement, it was impossible to collect from it for what term the parties contemplated the new lease should be given. The learned judge cited several cases, especially *Clinan* v: *Cooke*, (1 *Sch. & Lef.* 22,) to show that the agreement was so indefinite that a court of chancery would not enforce it.

In *Rutgers* v. *Hunter*, (6 *Johns. C. R.* 218,) the covenant was, that at the expiration of the term the lessor would pay the value of the buildings, to be appraised in the mode prescribed, or would *renew the lease*, or redemise the lot at such rent and upon such terms as might be agreed upon between the parties. The lessor being dissatisfied with the appraisement which was made, tendered a lease for the same term and at the same rent as in the former lease. The decision was, that the lessee was bound to accept the new lease, or to give up a claim for the appraised value. The chancellor decided the case upon the clause binding the lessor *to renew the lease*, which he says, implies the same term and rent; that the phrase *to redemise the lot* was analogous to the phrase *to let the lot for a yearly rent*, which was held, in *Abeel* v.

*Radcliff*, void for uncertainty. He proceeds to say, that he was not certain if the lease had only provided for a re-demise of the lot upon terms to be agreed upon, or to pay the valuation, that the defendant could have obstinately refused any terms. But he says, the question in such a case would be, not that the agreement was to be specifically enforced, but whether a party would be permitted to recover his improvements at law, when he, in fraud of the agreement, refused to accede to another lease upon any terms, however just and moderate.

A late case in the court of exchequer, (*Price* v. *Ashton*, 1 *Younge & Collyer*, 82,) was decided upon this distinction between an agreement for a new lease and a covenant to renew a former one. The Chief Baron says : " It ap-" pears to me on looking at the pleadings, that there is evi-" dence to show that the lease agreed to be given was in-" tended to be a renewal lease, and therefore, in point of " duration, coinciding with the former lease."

In the case of *Gordon* v. *Trevelyan*, (1 *Price's Rep.* 64,) certain letters which passed between the parties were held to contain an agreement to give a lease upon the same plan or in the usual way as those given by the lessor to his other tenants. The bill claimed that the leases were usually granted for 14 years, and insisted upon a lease for that time. But by the answer it appears that the terms were very different in different leases. It was held that there could be no specific performance of an agree-ment for a lease, where the terms and conditions were not actually expressed ; or the treaty should have reference to something by which they might be ascertained, and the term here was left in uncertainty.

In the case of *Bridges* v. *Hitchcock*, (5 *Br. P. C.* p. 6, *Toml.* ed.) there was a lease for 21 years at a settled rent, and a covenant that if the lessee should at any time before the expiration of the term, be minded *to renew and take a further lease* of the premises, then, upon application to the lessor before the last six months of the term, the lessor should grant such further lease as should by the lessee be desired, and under the same rents and covenants only as

1839.
Whitlock
v.
Duffield and
others.

in this lease. A decree was made that the lessor execute a new lease for 21 years under the same rent and covenants as in the old lease ; and the decree was affirmed by the Lords.

The great question in that case, was one which does not arise here, viz., whether a covenant for a further renewal, was to be inserted in the new lease. ·

Still the case involves a principle of consequence, and bearing upon the present. Its authority has always been admitted. (3 *Atk.* 88. *7th East*, 245.) What is there actually decided, is law at this day.

It appears from a report of the decision made by Mr. Melmoth, so eminently distinguished for classical attainments, and exemplary piety,(a) that the complainant, by his bill, demanded a new lease for sixty-one years. The defendant in his cross bill, offered a lease for twenty-one years, upon certain conditions, which it was held he could not demand. See the report, (1 *Hargrave's Juridical Arguments*, 426.)

The comment of Lord Ellenborough upon this case deserves attention. He observes, that the covenant left it to the lessee himself to say, what interest he would require to be granted to him, without any restriction or limitation, except that no covenant should be introduced not contained in the original lease. Nor was it unfair to infer from thence, that he, who might have asked a lease for any number of years, did not exceed what was intended, by requiring one with a covenant to renew. (*Ingulden v. May*, 7 *East*, 245.)

This decision, therefore, goes far to establish, that a covenant to grant a lease for such a term as the lessee shall require may, if the other conditions are defined, be enforced,

The case of *Hyde* v. *Skinner*, (2 *P. Wms.* 196,) involved also the question of a covenant for further renewal, but is instructive upon the point now considered. Skinner,

(a) Author of " The Importance of a Religious Life Considered," and translator of the letters of Pliny and Cicero.

the lessor, was possessed of a long term of years; for what period does not appear. He leased to Hyde for five years, and covenanted to renew the lease at the same rent, and on the same covenants, upon the request of Hyde, within the term. Considerable money was laid out, and a demand was made for a new lease for fifty years, at the old rent.

It is important to notice, that the terms of the covenant were, "to renew the lease for such further term as the "lessor should then desire." This does not appear in the report in Peere Williams, but is so stated in the report as cited by Mr. Hargrave, (1 *Harg. Jurid. Argmts.* p. 426.) It was decreed, that a renewal should be granted, but that the term of fifty years was too much, and the usual term of leasing being twenty-one years, the lessor should demise for that or any lesser term that the lessee should elect. The court refused to insert the covenant for a further renewal.

This case has been much criticised. Lord Hardwicke says, that it was not an authority in the case before him, and hardly in any case; the decree looked something more like an award and a compromise, than a decree. (*Furnival* v. *Crow,* 3 *Atk.* 88.)

Now with the clause in the lease, cited from the report given by Mr. Hargrave, the case of *Hyde* v. *Skinner* is substantially the same, as to the covenants, as *Bridges* v. *Hitchcock.* The decree in the former case, was for a renewal for the same term as that in the old lease, viz. twenty-one years. In the latter, for twenty-one years, when the old lease was but for five.

The case of *Clinan* v. *Cooke,* (1 *Sch. & Lefroy,* 22,) has always been referred to as a decisive authority, to show that the omission of the term in an agreement for a lease, is ground to refuse a performance, and cannot be supplied by parol.

It is, perhaps, not necessary to do more than refer to the general doctrine of the court, that to justify the specific performance of a contract, all its material terms and conditions must be in writing, either in the agreement itself,

or by a plain reference to a written paper, supplying an omission. Unquestionably the rent to be paid is as essential a term of a contract to lease, as the price upon a contract to sell. (See *Clinan* v. *Cooke,* before cited. *Hodges* v. *Horsefell,* 1 *Russel & Mylne,* 116. *Owen* v. *Thomas,* 3 *Mylne & Keene,* 356. *Mylnes* v. *Gery,* 14 *Vesey,* 406.)

In the case before the court, the contract is not to renew the old lease, but to grant a new one for the term of twenty-one years, upon such terms as the lessors shall think proper, and the lessees shall approve. I agree, that this is equivalent to a covenant to grant a lease upon such terms as the parties shall agree upon. It is precisely the same, as if it was an original contract for a lease. The term is defined, and every thing else of rent and covenants left uncertain.

As to these, we have the express decision of the supreme court, that at law it is void; and in the cases in this court which I have stated, there is not a decision to support a bill for performance. There is the doctrine, (always to be respected,) of Chancellor Kent, that it probably might be enforced; at least by this court, indirectly acting upon the party in such a way as would necessarily lead to performance.

As to the position taken by Sir Samuel Romily, to which the chancellor assimilates the question, viz., of an agreement to sell at the valuation of another person, and if the party refuses to name a valuer, that the court refers it to a master, it is unquestionable that there is no such law prevailing in this court.

In the first place, a covenant to appoint arbitrators to settle value, cannot be enforced. The court will not entertain a bill for the performance of such an agreement, nor will it substitute the master for such arbitrators. (*Agar* v. *Mucklew,* 2 *S. & St.* 420.) And next, where the parties in pursuance of such a stipulation have appointed valuers who cannot agree upon an estimate nor as to an umpire, the court will not fix a valuation by a master or otherwise. It will go so far as to enforce a valuation made by parties

agreed upon; and where the agreement is to sell at a fair valuation, no means of estimating being pointed out, it will adopt the means adapted to the purpose. (*Hopcraft* v. *Hickman,* 2 *S. & St.* 130. *Mylnes* v. *Gery,* 14 *Vesey,* 407. *Wilks* v. *Davis,* 3 *Meriv.* 507.)

The case of *Morse* v. *Merest,* (6 *Mad. Rep.* 26,) is not in hostility with these principles. The valuers had been in that case duly named, and were proceeding to make the appraisement. The defendant had refused to permit the appraisers to come upon the land. The court held, that it might decree that the defendant should permit the valuation to be made, and if it were so made, a supplemental bill must be filed for specific performance upon the terms of the valuation.

It is to be observed, that a covenant to pay for land by valuation, implies the intervention of others as appraisers, and the appropriate tribunal may reasonably be resorted to, where the parties have not named them. But an agreement to pay, at a price to be fixed by the parties themselves, excludes the notion of any other person interposing; is a contract left inconsummate and imperfect in a most material point, and without providing any mode of rendering that certain, which the parties have left indefinite. For this court to interfere in such a case, would be an act of as arbitrary discretion, as to make a contract for the party which he had never consented to.

My conclusion therefore is, that this covenant is too vague and uncertain, to be the foundation of a bill for specific performance.

II. But in the next place, the defendants, instead of apprising the complainant that they would not give a new lease, and taking the position that the covenant was not obligatory, prepare a lease and tender it. The question may then well arise, whether they have not given a construction to the covenant themselves, admitted that it bound them legally or equitably to give a new lease; and if this must be conceded, then I do not see how the inference can be avoided that they must tender a reasonable lease.

It is insisted that even on the supposition of such being their obligation, the lease offered was reasonable. If so, the complainant must fail in this object of his suit, and at least pay the costs, even if he should be permitted now to accept the lease.

The rent required by the new lease was $6,000, payable quarterly. Six thousand dollars for a term of twenty years, would be $120,000 received during that period. Reduced at five per cent. interest to present value, it would be $60,000; that is to say, the giving of such a lease is a damage to the lessors of that amount in cash. Much of the testimony on this point is conjectural, but I have given an attentive examination to it, and I consider that the rent demanded was not only unreasonable, but extravagant.

And as to the implication of an agreement to give a reasonable lease derived from the tender, I think the defendants were not bound. They may be considered as taking the ground that they denied a right to any lease, but were willing to give one upon specified terms, although they might be extravagant. But at any rate, when the lease was rejected, they have a right to replace themselves in the legal position in which they before stood. It amounts only to an offer to waive a legal defence upon certain conditions, which being declined, the offer falls.

I conclude that the court cannot give any relief in the form of directing a new lease to be executed.

III. The last important topic for consideration is the effect of the submission to the arbitrators.

The terms of the submission are, that they agree " to " stand to, abide, and perform the appraisement and valua- " tion to be made by the said appraisers, under and in pur- " suance of such covenant contained in the lease, after " such appraisement shall have been signified to them in " writing."

It is manifest, that no such clause was necessary or appropriate, in order fully to comply with the covenant in the lease to appoint appraisers. This submission was needless. The written appointment of Sprague and of Roberts, on the part of the complainant, and the written

appointment of Birbeck was all that the lease demanded; and these, annexed to the award, would have been sufficient for its full formality and force. The question then is, whether this submission did not create a new and binding agreement between the parties, to pay the award at all events.

The phrase " to stand to, abide, and perform the appraisement," means to pay the appraisement. There seems no other intelligible mode of performing it. But the clause " under and in pursuance of such covenant contained in " the lease," is referred to as indicating what performance was to be made; that is to say, it is insisted, the words mean, we will perform the award by paying the money, if we think proper, or if not, will offer a new lease; a singular conversion of a positive stipulation, into no stipulation at all. The lease already bound them to do that.

But I think that, by grammatical construction, this clause relates to the appraisement, the valuation to be made; that is, they will perform or pay such appraisement as, in pursuance of the covenant in the lease, the appraisers shall make. In this view, the words were perhaps needless; but very likely to be employed. The appraisement of the appraisers, was to be made under the covenant, and in pursuance of it.

I conclude, that under the true construction of this submission, a new agreement was made between the parties; one which bound the defendants to pay the award absolutely; one which became a substitute for the provisions and covenants of the lease, and one which, if the appraisement has been legally and fairly made, must be enforced.

There is also much reason for supposing that this was the actual intention of the parties in entering into it. The evidence establishes numerous declarations of Willoughby, Mrs. Lawrence, and Mrs. Prince, that the rope-walk would be removed; some assurances in a few cases, on the faith of which an enhanced price was obtained for lots. See especially the testimony of Beck, Lewis, Haynes, and Jenks. These declarations and assurances are certainly proofs of an intention not to grant a renewal, and there

could not be a more effectual mode of avoiding all questions and litigation upon the matter, than to agree to pay the amount which the appraisers should liquidate.

Against granting this relief, however, the objection is taken, that the remedy was perfect at law, and this court should not entertain the bill. It appears that the defendants, instead of putting in a special demurrer to this part of the case and this relief, filed a general demurrer. The court overruled it, holding that some relief might be granted. It is, therefore, precisely as if no demurrer had ever been interposed; and as the objection is not raised by the answer, it is too late to interpose it now. (*Grandin* v. *Le Roy*, 2 *Paige*, 509.)

Another objection to this relief has been taken. It appears from the testimony of Roberts, one of the appraisers, that the two appraisers and the umpire, could not agree in their estimates, and when they met, they added their separate estimates together, and divided the amount by three, and the result was adopted.

"It is a settled rule, that awards of referees appointed by a court, are upon the same footing as verdicts at law, and those reasons which will induce the court to grant a new trial, will prevail where there is an application to set aside an award." (*Kline* v. *Catara*, 2 *Gall.* 61. *Kelly* v. *Johnson*, 3 *Wash. C. C. Rep.* 45. *Knox* v. *Walton*, 2 *Ibid.* 507.)

It is settled in the courts of common law, that a verdict obtained by each juror putting down a sum, and dividing the aggregate by the number of jurors, is sufficient ground to set aside a verdict. (*Harvey* v. *Richett*, 15 *Johns.* 87. *Roberts* v. *Falls*, 1 *Cowen*, 238.)

A series of late English decisions has also established, that where arbitrators cannot agree upon an umpire, and a choice is made by tossing up, or putting the names in a hat and drawing, the appointment is bad, and the award will be set aside. " The appointment of the third person, " must be the act of the will and judgment of the two, must " be matter of choice, and not of chance, unless the parties " consent to, or acquiesce in some other mode." (*In the*

*matter of Casell,* 9 *Barn. & Cres.* 624. *Ford* v. *Jones,* 3 *Barn. & Ad.* 248. *In the matter of Turno,* 5 *Barn. & Ad.* 488. *In the matter of Jameison,* 4 *Adol. & Ellis,* 945.) There is also the case of *In re Greenwood,* (1 *Perry & Davison,* 461,) cited in the *Law Magazine* for August, 1839, which is not yet in our libraries. The point decided as stated in the Magazine, is the same as that *In the matter of Jameison.* There is also a case in chancery, (*Harris* v. *Mitchell,* 1 *Vernon,* 486,) to the same effect.

It is to be observed, that the late English cases are treated as overruling *Neale* v. *Ledger,* (16 *East,* 51,) in which it was held, that if each of two arbitrators nominates a person to be umpire, and neither objects to the person nominated by the other, but cast lots which of the two shall be the umpire, this does not vitiate an umpirage made under such an appointment.

There is a rule laid down by Chancellor Walworth, which, although made in relation to a different question, seems to me of great force and bearing upon the point before me. " An arbitrator," he says, " who has signed an " award with his co-arbitrators, cannot be allowed to con- " tradict this solemn act, and say that he did not concur " in it. The signing of the report was an actual concur- " rence therein." (*Campbell* v. *Western,* 3 *Paige,* 137. See also 2 *Johns. C. R.* 349.)

It has been laid down in several cases, that the affidavits of jurors cannot be received to impeach their verdict. (*Owen* v. *Warburton,* 4 *Bos. & Pull.* 426. *Lessee of Cluggage* v. *Swan,* 4 *Binney,* 150. *Price* v. *Warren,* 1 *Hen. & Mum.* 385.)

The case of *Dana* v. *Tucker,* (4 *Johns. Rep.* 487,) is very strong. On a motion to set aside a verdict, the affidavit of a constable was read, showing that the verdict was made up by dividing the aggregate of the separate sums by twelve. Affidavits of two of the jurors to the same effect were read. And affidavits of other jurors were read to support the verdict, showing the agreement, and that each ratified it subsequently, and on being polled in court, severally declared their assent. The court held,

that the affidavits of jurors were not to be received to impeach a verdict, though they might be to sustain it. That the jurors, after the result of the division was known, individually assented to the sum as their verdict. The motion was denied. (See *Wood* v. *Goold*; 5 *Pick.* 291.)

In the case in 1 *Cowen*, 238, relating to the verdict of a jury, it is not stated in what manner the mode adopted was proven before the court. The case in 15th *Johnson*, 87, arose upon a question of pleading. Upon a *certiorari* to a justice's court, there was an assignment of error, that the jurors had divided the total of the sums put down by each, by their number. Issue was joined *in nullo est erratum*, plainly taking it up as a question of law, and like a demurrer in chancery, plainly admitting for the argument, the fact alleged. There could be no other judgment on that state of the pleadings. But neither the question as to the mode of proof, nor the question of subsequent ratification, was presented.

In the English cases to which I have referred, there is nothing to show whether the affidavits of the arbitrators were received or not, except in the case *In the matter of Casell;* but there, Adams, the arbitrator, who made an affidavit tending to overthrow the award, had not signed it, and Chappel, whose affidavit was also received, swore to support it. At any rate, the point was not raised.

But I draw from the cases a more important principle, viz., that if a clear assent is given to the result, after that result has been reached in an irregular manner—if especially that assent is proven by an award signed by the arbitrators, the objection cannot be sustained.

Now, I believe that in all the English cases to which I have referred, except one, the question could not arise, because by their course of proceedings, when an umpire is appointed, he alone signs the award.. The arbitrators in such a case do not sign the award. There is therefore no subsequent ratification of what they agreed should be done in an illegal manner. *Harris* v. *Mitchell*, 2 *Vernon*, 485. In that case, after the arbitrators had disagreed, and the umpire was chosen by *cross and pile*, the arbitrators

endorsed on the bond of submission, that they had appointed Ramsey, the person upon whom the lot fell, to be the umpire. The award of the umpire was set aside.

In *Harris* v. *Mitchell*, *Ford* v. *Jones*, *In the matter of Turno*, and *In the matter of Jameison*, the umpire alone made the award. *In the matter of Casell*, the submission was to two persons, and such third person as they should appoint ; the award to be made by any two; and there one of the arbitrators refused to sign the award. Had there been a subsequent approval by signing the award, the distinction I have taken would have arisen.

There is nothing, I believe, in our courts, to shake the authority of *Dana* v. *Tucker*, (4 *Johns. Rep.* 487,) and that seems to me to establish the position I have taken.

As to the question raised in the answer, that the appraisers had included in their estimate the fixtures, &c., which the complainant removed afterwards, it is completely put at rest by the evidence of all of them.

There must be a decree for payment of the amount of the appraisement, with interest and costs.